Paula Darlene HAMPTON, Plaintiff,

v.

DILLARD DEPARTMENT STORES, INC., Defendant.

No. CIV.A. 97–2182–KHV.

United States District Court, D. Kansas.

Aug. 27, 1998.

See also, 985 F.Supp. 1055.

Arthur A. Benson, II, Aften P. McKinney, Kathy D. Finnell, Benson & Associates, Kansas City, MO, for Paula Darlene Hampton, Demetria Cooper.

Elaine D. Koch, Spencer, Fane, Britt & Browne, Kansas City, MO, Karen Kessler Cain, Spencer, Fane, Britt & Browne, Overland Park, KS, for Dillard Dept. Stores, Inc.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff Paula Hampton filed suit against Dillard Department Stores, Inc. ("Dillard's"), alleging that as part of Dillard's pattern and practice, its security officer, Tom Wilson, discriminated against her on the basis of race in violation of 42 U.S.C. § 1981.[1] Specifically,

---

1. Hampton also alleged that Wilson falsely imprisoned her in violation of Kansas law, but the Court granted summary judgment for Dillard's on this claim. Demetria Cooper, plaintiff's niece, joined in the complaint. The Court granted summary judgment for Dillard's on all of her

plaintiff claimed that Dillard's deprived her of her right to enjoy all benefits, privileges, terms and conditions of her contractual relationship with Dillard's. After a four day trial, the jury returned a verdict in favor of plaintiff, awarding $56,000 in compensatory damages and $1,100,000 in punitive damages. The Court entered judgment in accordance with the verdict. The matter now comes before the Court on defendant's *Motion For Judgment As A Matter Of Law, Or Alternatively For A New Trial Or Remittitur* (Doc. # 150) filed December 19, 1997.

## Judgment As A Matter Of Law Standards

 Judgment as a matter of law under Rule 50(b) "should be cautiously and sparingly granted." *Zuchel v. City and County of Denver,* 997 F.2d 730, 734 (10th Cir.1993). The Court must affirm the jury's verdict if "viewing the record in the light most favorable to [the nonmoving party], there is evidence upon which the jury could properly return a verdict for [the nonmoving party.]" *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,* 82 F.3d 1533, 1546 (10th Cir.1996). The Court does not "weigh the evidence, pass on the credibility of the witnesses, or substitute [its] conclusions for that of the jury." *Id.* The Court must enter judgment as a matter of law in favor of the moving party, however, if "there is no legally sufficient evidentiary basis ... with respect to a claim or defense ... under the controlling law." *Id.* at 1546–47 (quoting Fed.R.Civ.P. 50(a)). A legally sufficient basis requires more than a "scintilla of evidence" favoring the nonmoving party. *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1547 (10th Cir.1988).

## New Trial Standards

 The decision to grant a motion for new trial is committed to the trial court's sound discretion. *See Unit Drilling Co. v. Enron Oil & Gas Co.,* 108 F.3d 1186, 1194 (10th Cir.1997). In considering a motion for new trial, the Court must view the evidence in the light most favorable to the prevailing party. *See Joyce v. Davis,* 539 F.2d 1262 (10th Cir.1976); *Neyman v. United Tele-*

claims. *See* 985 F.Supp. 1055, 1061 (D.Kan. 1997), and *Minute Order Dismissing All Claims*

*comm., Inc.,* 1992 WL 97808, Case No. 90–2033 (D. Kan. April 7, 1992), *aff'd,* 1 F.3d 1249 (10th Cir.1993). "[T]he party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence." *White v. Conoco, Inc.,* 710 F.2d 1442, 1443 (10th Cir.1983). The Court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (further quotation and citation omitted).

## Evidentiary Standards

 "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Fed.R.Evid. 103; *see also Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1518 (10th Cir.1995) ("error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties, and the burden of demonstrating that substantial rights were affected rests with the party asserting error") (further quotations and citation omitted). A new trial should be granted, however, when the erroneous admission of evidence affected the substantial rights of the parties. *See* Fed. R.Civ.P. 61.

## Jury Instruction Standards

 The decision whether to give a particular jury instruction is within the sound discretion of the Court. The instructions as a whole must provide correct statements of the governing law and provide the jury with an ample understanding of the issues and applicable legal standards. *Allen v. Minnstar,* 97 F.3d 1365, 1368 (10th Cir.1996). The question is not "whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues." *Mason v. Oklahoma Turnpike Auth.,* 115 F.3d 1442,

*Of Plaintiff Cooper* (Doc. # 146).

1454 (10th Cir.1997) (further quotations and citations omitted).

## Factual Background

The Court first briefly summarizes the facts in this case, reserving a more detailed description of the evidence for later discussion of specific issues raised by Dillard's:

Plaintiff, an African–American woman, was shopping for an Easter outfit for her infant nephew on Good Friday, April 5, 1996. She, her niece Demetria Cooper, and four children went to the Dillard's store in Overland Park, Kansas, for this purpose. Shortly after they entered the store, Tom Wilson, a Dillard's security officer, took notice. He observed them for more than 15 minutes. He then asked fellow employee Pam Fitzgerel to continue the surveillance in a fitting room in the children's department, where plaintiffs were trying clothing on Cooper's one-year-old son. At trial, Fitzgerel claimed that Cooper was holding a rolled-up cloth item in the fitting room; that she later saw an item under Cooper's jacket; and that she therefore contacted Wilson and told him that she was positive that Cooper had put something under her coat.

The group left the fitting room. Plaintiff purchased an outfit for Cooper's son and when she did so, the sales associate gave plaintiff and Cooper coupons which were redeemable at the fragrance counter for cologne samples. Plaintiff's party then ventured to the fragrance counter, which is located at the nexus of Dillard's and the Oak Park Mall, to redeem their fragrance coupons. See Hampton v. Dillard Dep't Stores, Inc., 985 F.Supp. 1055, 1057 (D.Kan. 1997). Wilson interrupted plaintiff, however, as she was redeeming her coupon and talking with fragrance consultant Betty Chouteau. Wilson asked to look inside the Dillard's bag and emptied the contents on the fragrance counter. Wilson checked the items and the receipt, which matched. During this exchange plaintiff became upset and told Wilson that she did not appreciate being accused of shoplifting, that she spent a lot of money at Dillard's and that she did not deserve to be treated this way. Wilson told her to calm down or he would call the

Overland Park police and have her removed from the store. Plaintiff asked Wilson his name and the location of the customer service counter. She proceeded to the customer service counter and had no more contact with Wilson.

At trial, plaintiffs presented evidence that Dillard's had a pattern and practice of subjecting African–American shoppers to disparate security practices, and argued that Wilson's surveillance, stop, detention and search were a part of that pattern and practice.

## ANALYSIS

Dillard's asserts that it is entitled to judgment as a matter of law because plaintiff produced legally insufficient evidence that (1) she received a coupon for free cologne as a benefit or privilege of the contractual relationship; (2) Dillard's intentionally interfered with plaintiff's right to redeem the coupon; and (3) Dillard's intentionally discriminated against plaintiff on the basis of race. Alternatively, Dillard's asserts it is entitled to a new trial because (1) bifurcation of the contract issue and the discrimination issue prejudiced its right to a fair trial; (2) the Court erred in admitting numerous items of evidence; (3) the Court erred in instructing the jury; and (4) the damage award demonstrated passion and prejudice. Finally, Dillard's asserts that the evidence did not warrant submission of the punitive damages award to the jury or, if it did, that the amount of the compensatory and punitive damages demonstrates passion and prejudice and thus Dillard's is entitled to a new trial or remittitur.

## I. Judgment As A Matter Of Law

Dillard's asserts that plaintiff did not produce legally sufficient evidence to support her § 1981 claim, which required proof that (1) plaintiff was a member of a racial minority; (2) Dillard's had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir.1996). Dillard's contends that it is entitled to judgment as a matter of law because plaintiff failed to produce evidence on the second and third elements of her claim.

## A. Benefit Of Contractual Relationship Under § 1981

■ Dillard's first asserts that a coupon for a free cologne sample is not a contract interest which is sufficient to warrant protection under 42 U.S.C. § 1981. That statute provides in part that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" *Id.* § 1981(b). Dillard's asserts that as a matter of law the coupon for a free cologne sample was not a benefit of a contractual relationship.

Dillard's correctly points out that "the law of contracts is confined to promises that the law will *enforce*" and that "[c]ourts have generally been unwilling to enforce a promise unless the promisee has given the promisor something in return for it." Defendant's Memorandum in Support at 4, citing E. Allan Farnsworth, *Contracts,* § 1.1, at 4 (1982) (emphasis in original). In this case the bargained-for exchange was plaintiff's money in return for Dillard's Easter outfit; the consideration was money and clothing. Dillard's contends that § 1981 protects only the performance of the terms of a contract, and that because the free coupon was not part of the bargained-for exchange in this case, it was a gratuitous promise and was not enforceable.

■ Section 1981, however, as amended by the Civil Rights Act of 1991, specifically provides that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the *enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id.* § 1981(b) (emphasis added). This language provides that once a contractual relationship exists, a benefit or privilege of that relationship may not be withheld based on the race of one party to the contract— even if the benefit or consideration was not the consideration for the contract. *Cf. Morris v. Office Max, Inc.,* 89 F.3d 411, 414 (7th Cir.1996) (allegation of interference with "prospective contractual relations" does not state claim under § 1981; plaintiffs failed to "allege actual loss of a contract interest."). Thus, although in this case the free sample was not part of the bargained-for exchange, it could be a privilege or benefit of the contractual relationship. The question then becomes whether plaintiff presented sufficient evidence that the coupon was a privilege or benefit of the contractual relationship.

■ Dillard's cites testimony by witnesses who suggested that coupons were indiscriminately doled out to customers who had not made purchases, and argues that such evidence demonstrates that the coupons were not a privilege or benefit of a purchase. Only one of these witnesses testified about the coupon promotion on the date in question, however, and she testified that the coupons were given both to those who made purchases and to some who did not. Dillard's asserts that plaintiff presented no evidence that would support an inference that the coupons were a privilege or benefit of a purchase. This argument is rebutted by the testimony of plaintiff and Cooper, who both testified that although they were in the store for over an hour, they saw no one who was freely distributing fragrance coupons. Plaintiff and Cooper testified that neither one of them received a coupon until after plaintiff made a purchase.[2]

---

2. Plaintiff testified that her sales associate told her that she was entitled to a free gift because she had made a purchase. I Tr. Trans. at 122. Dillard's objected to this testimony as hearsay, and the Court instructed the jury that it could not be taken for the truth of the matter asserted.

The statement, however, was admissible as non-hearsay because it was offered as an admission by a party-opponent under Fed.R.Evid. 801(d)(2)(D) (statement offered against a party that is "a statement by the party's agent or servant concerning a matter within the scope of the

Plaintiff's argument is not discredited by the fact that Cooper received a coupon but bought nothing. Plaintiff's purchase was for Cooper's child, Cooper was part of plaintiff's shopping party, and the jury reasonably could have concluded that as a benefit of plaintiff's contractual relationship with Dillard's, plaintiff and her companion received coupons for free fragrance samples. Nor is plaintiff's argument discredited by the fact that other customers, of unidentified race and identity, received coupons without purchases. Whatever may have been the circumstance for other customers, the jury was entitled to find on this evidence that the fragrance coupons were a benefit of plaintiff's contractual relationship with Dillard's. Based on the evidence of record, the Court can not determine otherwise as a matter of law.

### B. Intentional Interference With Contract Benefit

■ Dillard's asserts that as a matter of law, even if the coupon was a benefit of plaintiff's contractual relationship, Wilson did not intentionally interfere with her right to redeem the coupon. Dillard's points out that the Court sustained its summary judgment motion on plaintiff's claim of false imprisonment and that in doing so it held that Wilson did not hold plaintiff against her will; that even if he had restrained plaintiff's liberty, he had probable cause to detain her on suspicion of shoplifting; and that plaintiffs therefore failed to create a jury question on the false imprisonment claim. Dillard's argument incorrectly assumes that because Wilson's actions were privileged under state law, he could not have interfered with plaintiff's right to redeem her coupon for a free fragrance sample. The record will reflect that the trial was bifurcated and that the first phase of trial dealt only with factual questions whether the coupon was a benefit or privilege of the parties' contractual relation-

ship and whether Wilson interfered with plaintiff's attempt to obtain that benefit or privilege. The Court has already addressed the first question. As to the second, plaintiff and Cooper both testified that plaintiff was in the process of redeeming her coupon when Wilson stopped Cooper, who was carrying the Dillard's bag which contained plaintiff's purchase. Betty Chouteau, the perfume consultant, also testified that plaintiff was redeeming the coupon when Wilson intervened.[3] Based on these circumstances, the jury could reasonably conclude that Wilson intended to interfere with plaintiff's redemption of the coupon. Thus plaintiff produced legally sufficient evidence that Wilson intentionally interfered with her redemption of the coupon.

### C. Intentional Racial Discrimination

■ Dillard's asserts it is entitled to judgment as a matter of law on plaintiff's § 1981 claim because in granting Dillard's summary judgment on the false imprisonment claim the Court found that Wilson had probable cause to stop plaintiff. Dillard's argues that even if Wilson interfered with plaintiff's contractual right by conducting an investigative stop, he had a legally sufficient excuse because he reasonably believed that Cooper was attempting to steal from Dillard's. Dillard's argues that this legal excuse is a legitimate nondiscriminatory reason for the stop. It then asserts that plaintiff can not show that the stop was a pretext because the Court ruled on summary judgment that Wilson had probable cause to stop her and that plaintiff had no direct evidence of discrimination.

■ Plaintiff could carry the burden to show that Dillard's discriminated on the basis of race "either directly by proving [defendant] acted with a discriminatory motive" or "indirectly by showing that [defendant]'s proffered reasons are pretextual."[4] *Elmore*

---

agency or employment, made during the existence of the relationship").

**3.** Chouteau testified that she had given plaintiff the sample when Wilson interrupted their conversation, but she also testified that she was not certain whether plaintiff took the free sample or

what she did with it if she took the sample. I Tr. Trans. 119.

**4.** Defendant also asserts that the Court abused its discretion by allowing plaintiff to introduce evidence which attacked Wilson's credibility after it held, on summary judgment, that his deposition testimony was credible. The credibility of a wit-

*v. Capstan, Inc.,* 58 F.3d 525, 530 (10th Cir. 1995) (further citations and quotations omitted). "In the final analysis, the [trier of fact] is required to weigh all the evidence and to assess the credibility of witnesses in order to determine whether the plaintiff was the victim of intentional discrimination based upon protected class characteristics." *EEOC v. Flasher,* 986 F.2d 1312, 1317 (10th Cir.1992). The ultimate determination of "whether there was intentional discrimination against a protected class is considered a question of fact." *Id.*

Dillard's asserts that plaintiff offered no evidence at trial to support a conclusion that Dillard's had any motivation to intentionally deprive her of the benefit of the free perfume sample due to her race. Dillard's fails to appreciate, however, that discriminatory animus may be inferred from the simple showing of pretext. As the Tenth Circuit noted:

> [A] showing of pretext is evidence which allows a jury to infer discriminatory intent. Consequently, because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment stage is sufficient to get the case to the jury. This conclusion flows directly from the Supreme Court's analysis in *St. Mary's Honor Ctr. [v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)]*, where the Court observed that "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Id.,* 509 U.S. at 510–11, 113 S.Ct. at 2749. The Supreme Court had issued a similar ruling earlier in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) when it said that a plaintiff may satisfy her "ultimate burden of persuading the court that she has been a victim of intentional discrimination . . . by showing that an employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095.

*Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995) (footnote omitted) ("if this inferential evidence is sufficient to allow a

plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial."). In this case, after a full trial on the merits the burden-shifting *McDonnell Douglas* analysis has dropped out, leaving the "single overarching issue whether plaintiff adduced sufficient evidence" to warrant the jury's determination that Wilson intentionally discriminated against plaintiff on the basis of her race. *See Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 744 (10th Cir.1991).

Dillard's asserts that the Court conclusively determined at summary judgment that Wilson had probable cause to detain plaintiffs, and contends that the Court erred in refusing to instruct the jury that it had so ruled. *See* Fed.R.Civ.P. 56(d) ("court should make an order specifying the facts that appear without substantial controversy"; and "[u]pon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."). The Court granted summary judgment on plaintiff's false imprisonment claims because on the summary judgment record it found that Dillard's had produced unrefuted evidence that Wilson had probable cause to stop plaintiff. *See Hampton,* 985 F.Supp. at 1061. The Court stated as follows:

> In this case . . . plaintiffs fail to identify material questions of fact which prevent summary judgment on the issue of probable cause.

> While plaintiffs argue that a jury issue exists as to Wilson's credibility, they cite no evidence which seriously calls into question either Wilson's credibility or that of Fitzgerel—who independently observed Cooper in the fitting room. In the circumstances, plaintiff's evidence, taken together, is insufficient to establish a reasonable inference that Wilson's testimony is unworthy of belief.

*Id.*

 Although Dillard's correctly notes that Rule 56(d) "empowers a court to specify (and set to one side) facts that are without substantial controversy, the rule nevertheless

---

ness is always an issue at trial, however, even if summary judgment was based in part on a find-

ing that the witness was credible. *See* Fed. R.Evid. 608.

'permits the court to retain full power to make one complete adjudication on all aspects of the case when the proper time arrives.'" *Colasanto v. Life Ins. Co. of N. Am.,* 100 F.3d 203, 210 (1st Cir.1996) (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2737 (2d ed.1983)). "An order granting a judgment on certain issues is a judgment on those issues. It forecloses further dispute on those issues at the trial stage. An order denying a motion for partial summary judgment, on the other hand, is merely a judge's determination that genuine issues of material fact exist. It is not a judgment, and does not foreclose trial on the issues on which summary judgment was sought. It does not settle or even tentatively decide anything about the merits of the claim." *Glaros v. H.H. Robertson Co.,* 797 F.2d 1564, 1573 (Fed.Cir.1986) (further quotation omitted). In the instant case the Court did not grant Dillard's summary judgment motion on plaintiff's § 1981 claim, and the Court's probable cause finding at summary judgment was not determinative of the § 1981 claim.

Dillard's argument also is based upon the faulty premise that if Wilson had probable cause to stop plaintiff, that probable cause could not be a pretext for discrimination. *See, e.g., Tanner v. Heise,* 879 F.2d 572, 580 n. 5 (9th Cir.1989) ("mere compliance" with state law did not shield police from liability if plaintiff could prove officers were motivated to arrest him as harassment for religious beliefs); *Johnson v. Morel,* 876 F.2d 477, 479 (5th Cir.1989) (viable equal protection claim where officer humiliated plaintiff on basis of race during lawful arrest). It ignores the fact that probable cause may clearly be a pretext for discrimination when security officers detain only *minority* shoplifting suspects while letting their majority counterparts tend freely to shoplifting business. It further ignores the fact that probable cause, which implicates an objective inquiry, and lack of discriminatory intent, which is an inherently subjective topic of inquiry, are not fungible concepts. Probable cause does not mean lack of discriminatory intent any more than lack of probable cause means racially-based animus.

Dillard's also argues that plaintiff produced no direct evidence of discrimination. Dillard's notes that Wilson used no racial epithets during the incident. Although such evidence may support a finding of discriminatory intent, it is not required. *Cf. DeNovellis v. Shalala,* 124 F.3d 298, 301 (1st Cir.1997) (Title VII discrimination may involve racial slurs or other types of racially motivated harassment). Dillards also contends that plaintiff produced no evidence that it instructed Wilson to target African–American shoppers or that Wilson was racist in his treatment of shoppers or in his work as a Kansas Highway Patrolman.

Dillard's argument misses the mark. In *Hall v. Pennsylvania State Police,* 570 F.2d 86 (3d Cir.1978), plaintiff sued a bank and several state officials, alleging that pursuant to a racially inspired policy of photographing "suspicious" black men and women, defendants photographed him when he entered the bank. The Third Circuit found that the plaintiff's § 1981 claim survived a motion to dismiss for these reasons:

> Section 1981 obligates commercial enterprises to extend the same treatment to contractual customers "as is enjoyed by white citizens." Here, plaintiff asserts that upon entering the premises to transact business, his photograph was taken for the police by bank employees pursuant to a racially based surveillance scheme. He received disparate, and because it was based on race, disparaging treatment for which the record offers no justification.

> This was not the isolated act of an individual employee, but rather the implementation of a policy deliberately adopted by the bank management to offer its services under different terms dependent on race.

*Hall,* 570 F.2d at 92.

"The issue of intent ... is one that is often not susceptible to direct proof, and a court should consider all conflicting inferences that may be presented by the circumstantial evidence in the case." *Washington v. Duty Free Shoppers, Ltd.,* 710 F.Supp. 1288, 1289 (N.D.Ca:1988), citing *Rogers v. Lodge,* 458 U.S. 613, 618, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). A plaintiff may present a vari-

ety of types of evidence to establish that defendant's stated reasons for its actions were pretextual. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Statistical data showing defendant's pattern of conduct toward a protected class can support an inference that defendant discriminated against individual members of the class. *See Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746 (10th Cir.1991) (employer's pattern of conduct can create inference that employer discriminated against plaintiff); *cf. Lewis v. J.C. Penney Co.,* 948 F.Supp. 367, 372 (D.Del.1996) (black woman who alleged § 1982 violation based on claim she was falsely accused of shoplifting did not allege or produce facts suggesting store had discriminatory policy; also did not allege interference with contract).

Plaintiff presented evidence that Dillard's employees routinely targeted and investigated African–Americans as shoplifting suspects. Two former Dillard's security officers, Michael R. Imber and David Cole, testified that they resigned from Dillard's, in part, because of its discriminatory practices. *See* II Tr. Trans. 208, 239–40. Further, though security officers told management that they were concerned about racial discrimination by Dillard's, Dillard's took no action to address these concerns. *See* II Tr. Trans. 245, 262. Plaintiff also presented testimony that through race codes, Dillard's targeted black customers (but not white customers) when they entered the store. II Tr. Trans. 211, 239–40, 259–60. Imber also testified that from 1991 through 1994, when he was a field supervisor for the Overland Park Police Department, he was instructed to oversee officers dispatched to a Dillard's shoplifting arrest because of the police department's concern about "bad arrests" at Dillard's. II Tr.

Trans. 213–15. Imber also testified to his opinion, based on his experience after April, 1994, that Dillard's "preyed on" and targeted African–American shoppers. *Id.* Plaintiff also presented testimony that store incident reports identified shoppers by race and by no other characteristics, and that in contrast to their white counterparts, African–American shoppers were written up for "suspicious" activity such as returning merchandise without a receipt.

Plaintiff presented evidence that Wilson placed her under surveillance shortly after she entered the store. Wilson's incident report reflected the practice of using racial identifiers for those who engaged in suspicious activities.[5] The record therefore contained evidence that Wilson targeted plaintiff and her niece at least in part because of this discriminatory practice, and that in so doing Wilson interfered with plaintiff's enjoyment of a benefit of her contractual relationship with Dillard's in violation of § 1981. The Court therefore overrules Dillard's motion for judgment as a matter of law.

## II. Motion for New Trial

As an alternative to its motion for judgment as a matter of law, Dillard's moves for a new trial or remittitur.

### A. Bifurcation

One day before trial, the Court decided sua sponte to bifurcate the trial. Although Dillard's did not object, it now asserts that bifurcation was prejudicial.[6] "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conductive to expedition and economy, may order a separate trial of any claim, ... or of any separate issue." Fed.R.Civ.P. 42(b). "Only one of these criteria need be met to justify bifurcation," and "Rule 42(b) places

5. The "Dillard's Security Report" which Wilson completed included a space for the race of each subject. The narrative part began with Wilson's statement that he was "watching two black females with two kids and a stroller." It explained that "[t]he black female that had on a dark leather coat [had a pair of pants]" and that "[t]he other black female left the area with the children." Wilson used the term "black female" twelve times in the 1½ page hand-written report. Plaintiff's Trial Ex 5.

6. *See Defendant's Reply To Plaintiff's Memorandum in Opposition To Motion For Judgment As A Matter Of Law, Or Alternatively For New Trial Or Remittitur,* Exhibit A, Transcript of Telephone Conference, Dec. 3, 1997 11; 12–14. Dillard's did state that it would object to "any argumentative voir dire on race as potentially tainting the jury on these simple issues." *Id.* at 20.

the decision to bifurcate within the discretion of the district court. The rule clearly suggests that a court may bifurcate a trial on its own motion. A decision ordering bifurcation is dependent on the facts and circumstances of each case." *Saxion v. Titan–C–Manufacturing, Inc.*, 86 F.3d 553 (6th Cir.1996) (internal citations and quotations omitted).

In this case, it was clear before trial that the issue of race discrimination was entirely severable from the narrow and technical issues whether the fragrance coupon was a benefit or privilege of the contractual relationship and whether Wilson intentionally interfered with plaintiff's exercise of that privilege. Negative findings on these narrow threshold questions could have rendered moot the remaining evidence of discrimination—which constituted the vast majority of the evidence to be presented at trial. Dillard's now asserts, however, that the issues were not clearly separable and that by dividing the issues of "intentional interference" and "discrimination," the Court lowered plaintiff's burden of proof. The second phase of the trial, however, required the jury to find that Dillard's intentionally discriminated against plaintiff because of her race. The circumstances met the Rule 42 need for economy, and thus bifurcation was not an abuse of discretion.

Dillard's also argues that several prejudicial aspects of bifurcation entitle it to a new trial. First, Dillard's states that after empaneling the jury, the Court told the jurors that this was an important race discrimination case with a lot at stake, and suggested that the first phase of the trial was only a stepping stone to be endured before getting to the heart of the case.[7] This argument mischaracterizes the Court's comments. In introducing the case, the Court stated that "[t]his is a race discrimination case." I Tr. Trans. at 13. After briefly summarizing the parties' theories, it described the expected length of trial, stated that "[t]his is an important case to the parties," and added that "the lawyers and their clients have a lot at stake." *Id.* at 14. This introduction to the case was not "highly prejudicial and misleading," and it did not encourage the jury to find for plaintiff in phase one out of a sense that it would be only fair to hear the entire case.

Dillard's also complains that in the first phase of trial, when plaintiff's counsel made a comment about a "wrongful stop," the Court refused to instruct the jury that as a matter of law, Wilson had probable cause to detain plaintiff. The Court did instruct the jury that "the officer's motivation for stopping the plaintiff and her party has nothing to do with what you're going to decide at this part of the trial, so you can ignore everything concerning his motives and why he might have stopped them." *Id.* at 181. The jury instructions in the first phase clearly instructed the jury to consider the narrow questions before it. Absent evidence to the contrary, the Court assumes that the jurors followed the instructions. *See Shamrock Drilling Fluids, Inc. v. Miller*, 32 F.3d 455, 460 (10th Cir.1994).

## B. Evidentiary Rulings

Dillard's next asserts that the Court erred in admitting certain evidence and excluding other evidence. Under Federal Rule of Evidence 401, "relevant evidence is that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be with-

---

**7.** This comment was part of the stock preliminary instructions which the Court gives as it introduces the voir dire process at beginning of each trial. As in other cases, the Court told the jury that the case had been on file for a long time, that the case was an important one to both the parties and the attorneys, who both had a lot at stake, and that they were entitled to a fair jury to decide the issues of fact presented. *See* I Tr. Trans. at 14.

Dillard's also states that on a radio talk show on December 28, 1997, the jury foreperson stated that the Court led the jury to believe the case should have been settled. The Court did not hear that broadcast, and it is not aware that it made any statements before or after trial which communicated any such opinion to the jury. Certainly the Court's comments during voir dire suggest nothing about the Court's views on settlement. If the jury foreperson based her alleged comment on statements which are not contained on the record, the comments had to have been made to the jury after it had returned its verdict. The Court did not discuss the case with any juror, except as reflected on the record, prior to that time.

out the evidence.'" *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1518 (10th Cir. 1995) (quoting Fed.R.Evid. 401.) "The Rule's basic standard of relevance thus is a liberal one." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "[E]rror in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties, and the burden of demonstrating that substantial rights were affected rests with the party asserting error." *Gomez*, 50 F.3d at 1518.

Dillard's contends that it is entitled to a new trial because "the bulk of the evidence produced by plaintiff at trial was unrelated to Officer Wilson, plaintiff, or the time period when the alleged intentional discrimination took place." *Memorandum In Support Of Defendant's Motion* at 16. This is a sweeping argument, one which is difficult to analyze because Dillard's motion largely fails to cite the relevant trial record on this issue. Based on Dillard's pre-trial and post-trial motions, however, along with the trial record, the Court will address the claims of evidentiary errors with as much specificity as possible.

■ Before trial, Dillard's filed a motion in limine to exclude "all speculative or conclusory testimony and evidence alleging without factual foundation that defendant is racist as well as other irrelevant testimony." Doc. # 81. Dillard's asserted that plaintiff should not opine that it had racist practices because such testimony lacked the factual foundation required by Rule 701 for lay opinion testimony. Dillard's further argued that lay opinion evidence of alleged racism should be excluded because it was not relevant and even if relevant, that its probative value did not outweigh its prejudicial effect. *See* Fed. R.Evid. 401, 402, 403.

■ Lay opinion testimony is admissible when it is "(a) rationally based on the perception of the witness," and (b) "helpful to a clear understanding of the witness' testimony

or the determination of a fact in issue." Fed. R.Evid. 701. The fact that lay opinion bears on an ultimate issue in the case does not render it inadmissible. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997).

At a hearing on the motion, the Court first ruled that under Fed.R.Evid. 701, lay witnesses could testify concerning an opinion that a Dillard's employee treated them in a racist manner if the opinion was based on personal experience. Doc. # 149 at 27–28. The Court expressed concern, however, about putting time limits on this sort of "anecdotal evidence." *Id.* at 28. In response, plaintiff asserted that for at least nine years before her incident, security guards and employees at Dillard's focused upon African–Americans in a discriminatory manner, that such practices had been passed on to new employees as part of their on-the-job training, and that such evidence was relevant because it proved a continuing policy and practice. *Id.* at 29; 37. The Court stated:

> [i]t seems to me there [are] two issues. One is, did Dillard's have a pattern and practice, and, number two, if they did, were Wilson and Pam Fitzgerel implementing that pattern and practice when they had an encounter with these plaintiffs. Because even if they had a pattern and practice, if these people weren't following the pattern, that doesn't get you anywhere. They have to have an intent to discriminate.
>
> And so what is it about the facts of this case that links these two individuals with this so-called practice and pattern?

*Id.* at 34.

In a lengthy colloquy, plaintiff responded that she could tie Wilson's actions[8] to the alleged pattern and practice because he had received on-the-job training during his employment. *Id.* at 36. The Court acknowledged that Wilson's own training would be relevant but questioned the relevancy of evi-

---

8. Plaintiff noted that while Wilson claimed that his attention had been drawn to plaintiff because of her nephew's baby stroller and because Cooper looked suspicious, plaintiff contended that in fact Wilson's attention was drawn to them because of the long-standing pattern and practice of super-surveillance of African–Americans. Plaintiff pointed out that Wilson's credibility would be crucial on this issue.

dence regarding the training of guards who had no connection with plaintiff. *Id.* at 37.

Plaintiff pointed to the practice of calling security codes when African–American customers entered the store, watching them, following them, and stopping them more often than white customers. The Court responded "[w]hat you're talking about is pattern and practice evidence. Again, we're talking about two separate things. But ... we are not going to have a parade of people through who are going to say that I went to Dillard's and I wasn't treated right as a customer or I was wrongfully arrested." *Id.* at 43. After further discussion, the Court stated that

> [I]t's not material whether Dillard's had a pattern and practice unless you can show Wilson and Pam Fitzgerel were acting pursuant to that when they had their encounters with plaintiffs in this case. And so I think it's a reasonable limitation to restrict the scope of the evidence to events which occurred ... on or after the time that Wilson started working there. That would be as to 404(b) acts of discrimination.
>
> If you want to put in evidence about training or lack of training, you know, specific policies, I am not meaning to tie your hands on that at all. But that would be my ruling on the defendant's motion in limine. And if you can lay a foundation for evidence beyond that at trial, then you need to approach the bench and we'll hash that out outside the jury's hearing.

*Id.* at 52.

Dillard's asserts that the Court abused its discretion in allowing opinion testimony about alleged discrimination as far back as the late 1980's, while not allowing evidence of specific discriminatory acts. The Court's ruling allowed for plaintiff to establish a foundation for Rule 701 lay opinion testimony while limiting the potential for prejudice under Rule 404(b). For example, a guard who testified that he worked at Dillard's for years has shown enough personal knowledge to rationally testify that based on his observations, African–Americans were targeted for more surveillance than whites. Further, the Court did allow evidence of specific incidents involving targeting of African–Americans, even before Wilson was employed. These incidents were relevant to show a pattern and practice where plaintiff produced evidence of the continuity of management from the time of that incident to the time Wilson was trained. The Court balanced the need for a foundation for lay opinion testimony with the need to exclude evidence of prior acts under 404(b) [9] unless offered for a proper purpose. To the extent that witnesses were allowed to testify under Rule 701, the Court allowed enough testimony to establish a foundation for the lay opinions. Further, a review of the trial transcript indicates that most of the testimony to which Dillard's objected was properly admitted.[10] This evidence included:

1. Michael Imber's testimony that he quit his security job at Dillard's because he "didn't like the way that Dillard's, some of the associates and security personnel treated black customers." II Tr. Trans. 208. The Court admitted this evidence under Rule 701, finding that it would be relevant and helpful to the jury. The Court allowed Imber to testify that he spoke to management about his concerns. *Id.* at 208–209. This evidence was relevant to the training issue, and it

---

**9.** Under Rule 404(b): "(1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed.R.Evid. 105, upon request, the trial court shall instruct the jury that the evidence of similar acts is to be considered only for the proper purpose for which it was admitted." *United States v. Meacham,* 115 F.3d 1488, 1494 (10th Cir.1997) (citing *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). In this case, evidence of prior incidents of targeting African–Americans

was relevant to show motive, intent, and knowledge of Dillard's. The probative value of this evidence was not substantially outweighed by its potential for unfair prejudice, and Dillard's did not request a limiting instruction. Evidence of the incidents of targeting African–Americans was also admissible under Fed.R.Evid. 406 to show the routine practice of Dillard's.

**10.** In its motion for judgment as a matter of law, Dillard's does not predicate its claim of error on "general testimony" or "prior incidents" which are specifically identified in the trial record.

demonstrated that management knew about potential race discrimination. On cross-examination, Imber admitted that "generally speaking" he did not think Dillard's is discriminatory. *Id.* at 219–220. On further cross-examination, Imber testified that he resigned before Wilson began working for Dillard's, *id.* at 216, and that he had never heard any complaints about how Wilson treated African–Americans.

2. Testimony by David Cole, who worked as a security guard for Dillard's in 1990 and 1991. Cole testified he quit his job, in part because sales associates routinely reported black customers coming into the store and asked him to follow them for no reason. *Id.* at 239. The Court allowed this testimony as relevant to the policy and practice of Dillard's. *Id.* at 238.

3. Testimony by Darrold Conrad, who was employed as a security guard at Dillard's from 1986 through early 1992. *Id.* at 243. Conrad testified that he reported to Dillard's management, including Rodgers and operations manager Marva ("Marvie") Dirks, that he was sometimes called to investigate matters concerning minority customers who in his opinion had been stereotyped as shoplifters. *Id.* at 244–45. This testimony was relevant to show the knowledge of Dillard's management.

4. Testimony by Gregory Powell, a Dillard's security guard who worked from 1987 to 1994. Powell testified that on many occasions African–Americans were closely watched while white customers were allowed to freely engage in similar behavior. *Id.* at 261. He told Dirks that training in this area would be helpful. Again, this testimony was relevant to the knowledge of Dillard's management and to the lack of training.

5. Testimony by Byron Pierce, a security officer with Dillard's from 1990 to 1992 and again in 1997. Pierce testified that he has been called to investigate African–American customers more frequently than white customers. III Tr. 468. He also testified that in mid-to-late 1997, he was working plain clothes security and received a call reporting that a black man was walking around the store. It soon dawned on him that he was the subject of the report, even though he had done nothing suspicious. *Id.* at 469. Pierce also testified about an incident in which a Dillard's security officer without probable cause took clothing from an African–American shopper who had gone to her car, and told her she could not have it back unless she produced a receipt. *Id.* at 474. This testimony related for the most part to the time period during which Wilson worked, and was relevant to the pattern and practice of Dillard's in targeting African–American shoppers.

6. Testimony from Sondra Samuels that when she was shopping at Dillard's in the fall of 1997, she was followed throughout the entire time she shopped. *Id.* 483. She was dressed in a business suit and she was not carrying any bags, but Samuels testified that she believed she was followed because she was black. *Id.* at 485. She also testified that when she called management about the incident she received no apology. *Id.* at 489. This testimony was relevant to show the knowledge of Dillard's management concerning the security practices at the time Wilson was employed at Dillard's.

For the most part, plaintiff tied the challenged testimony of such witnesses to recent policy and practice at Dillard's and/or management's knowledge of discrimination and failure to train security guards and other employees on this issue.[11] *Cf. Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1186 (5th Cir.) (without testimony of circumstances, or "without examples of blacks who were scrutinized while similarly-situated whites were not," conclusory statements that blacks were closely "watched" in employment setting were incompetent to establish pattern

11. The testimony of Geraldine Jones is another area of possible dispute. Jones testified that she worked as a security guard at Dillard's from 1987 to 1990, under store manager Jack Rodgers. *Id.* 229. Rodgers was still manager at the time relevant to this case, and plaintiff tried to question Jones about whether she had ever discussed with Marvie Dirks, the operations manager at the Oak Park store, how Dillard's treated African–American customers. The Court sustained Dillard's objection as to relevancy, however, and there is no basis for error in Jones' testimony. The Court does not discuss it further. *Id.* at 231.

of discrimination), *cert. denied,* —— U.S. ——, 118 S.Ct. 366, 139 L.Ed.2d 284 (1997). Cole's testimony, however, concerned events well beyond the two-year limit the Court originally set for specific incidents, and it was perhaps not closely tied to current policy and practice or management knowledge. Given all of the testimony which was properly admitted in this case, however, it could not have affected the substantial rights of Dillard's. Further, the record reflects that even if the Court erred in excluding evidence of some specific acts while allowing general conclusions based on those acts, Dillard's was allowed to effectively cross-examine these witnesses about their conclusions and the grounds for them.

■ The Court next addresses Dillard's assertion that the Court abused its discretion because it admitted without sufficient foundation lay testimony that Wilson was racist. Specifically, Cooper testified that she believed Wilson's acts were racist because he was "snotty." II Tr. Trans. 302. Plaintiff also testified that she believed Wilson had stopped her because she was black, based on her observation that he appeared angry, was "red in the face," and "his whole attitude was how dare you question me this way." II Tr. Trans. 325. These observations may be compatible with a race-based animus, but there is little foundation for these two witnesses' testimony that Wilson harbored racial animus toward them. *Cf. Alexis v. McDonald's Restaurants of Mass., Inc.,* 67 F.3d 341, 347 (1st Cir.1995) (witnesses' inferred racial animus based on personal observations that person was "unfriendly" acted "angrily," etc.; although observations compatible with race-based animus, no foundation for such an inference). Although the credibility of the opinion testimony and the weight to be given it are questions for the jury, *see Brown v. McGraw–Edison Co.,* 736 F.2d 609, 616 (10th Cir.1984), the Court perhaps erred admitting this lay opinion evidence. By itself, however, the erroneous receipt of such evidence does not entitle Dillard's to a new trial. Dillard's cross-examined both witnesses extensively on this testimony and whether they had a rational basis for their opinions. Given the abundant independent evidence regarding Dillard's treatment of minority shoppers, the Court is certain that the self-serving testimony of plaintiff and Cooper on this issue had no material effect on the jury.

■ Dillard's also attacks admission of evidence that it characterizes as "rumor" regarding the scheduling of security officers. This evidence dealt with the fact that according to Imber and Powell, Dillard's started to schedule work shifts for security officers based in part on how many people they apprehended. This change was a factor in Imber's decision to quit, and plaintiff asserts that it was admissible as an exception to the hearsay rule. *See* Fed.R.Evid. 803(1). In any event, operations manager Dirks testified that she compiles her schedule for security officers based in part upon their effectiveness as officers, including the number of apprehensions. This evidence was admissible and in any event could not have affected the substantial rights of Dillard's.

■ Dillard's next asserts that the Court improperly allowed plaintiff to impeach Wilson with evidence of incidents of untruthfulness, one of which occurred over 20 years ago. Under Fed.R.Evid. 608, specific instances of past misconduct that is probative of a witnesses' character for truthfulness may be the subject of inquiry on cross-examination, although it may not be proved by extrinsic evidence. The rule gives the Court discretion and does not include a recency requirement. Although the recency is certainly a factor which the jury may consider, the Court did not abuse its discretion in allowing plaintiff to inquire of Wilson about an incident in which he was suspended for filing an erroneous leave report. Evidence of an allegation of an incident in 1995 for which Wilson was ultimately cleared was also not erroneously admitted. The jury heard Wilson's explanation and could give it appropriate weight.

■ Dillard's next asserts that the Court erred in admitting statistical evidence of the race of persons involved in arrests and other incidents. Several witnesses, including Dirks and other Dillard's employees, testified concerning the incident log which included racial codes from which plaintiff gleaned damning

statistical evidence. Dillard's asserts that the statistical evidence was more unfairly prejudicial than probative, and argues that this evidence had no relevance to the question whether Wilson intentionally discriminated against plaintiff by interfering with her ability to redeem her free fragrance coupon. Dillard's also contends that the Court erred in admitting the Security Incident Log, Ex. 3, the History of Arrests Document, Ex. 6, and the Compilation of Data from History of Arrests, Ex. 7, because these exhibits were prejudicial and misleading.[12] The Court disagrees. This evidence was indirect evidence that Dillard's had a corporate policy which targeted African–American and other minority shoppers for security purposes.

■ Dillard's next argues that the Court erred in refusing to admit plaintiff's exhibit 15, a statement which plaintiff gave about the incident on April 5, 1996. Dillard's offered this exhibit as an admission against interest, Fed.R.Evid. 801(d)(2), to show that in her initial statement plaintiff did not allege that the incident was racially motivated. Even if it the Court erred in excluding this statement, plaintiff admitted on cross-examination that she did not initially tell the store manager that she believed the incident was racially motivated; thus Dillard's was not prejudiced by any error.

■ Dillard's next contends that the Court erred in allowing plaintiff's counsel to read from Chouteau's statement in cross-examining Dirks. Dillards alleges that this allowed plaintiff to use hearsay testimony without Dillard's being able to cross-examine Chouteau. Plaintiff points out that Dillard's had made much of the fact that on the day of

the incident, plaintiff did not claim that it was racially motivated. Dirks had testified that she had read the reports, including Chouteau's report, and that she found in them no claim of race discrimination. Thus, it was proper for plaintiff to use the statement to cross-examine Dirks.

■ Finally, Dillard's asserts that the Court erred in allowing plaintiff to offer rebuttal testimony that Daryl Hayes, a Dillard's employee, used the " 'N' word" while working for Oak Park Mall Security in the early 1990's. Plaintiff contends such testimony was proper rebuttal evidence under Fed. R.Evid. 613(b) because Hayes had denied ever using the word and Dillard's could have recalled him as a witness. Plaintiff points out that Fed.R.Evid. 608(b) does not preclude rebuttal evidence if offered to show that a statement made on direct examination is false, even if that statement is collateral. *See United States v. Fleming,* 19 F.3d 1325, 1331 (10th Cir.1994). Dillard's counters that it was not rebuttal evidence because it merely contradicted evidence raised by plaintiff on cross-examination. The Court first notes that according to plaintiff's proffer, the tendered testimony was that Hayes used this word *while working for Dillard's.* This proffer turned out to be in error. Though the Court recognizes that this testimony raised a potential for prejudice, evidence that Dillard's employees demonstrated racial animus was relevant to the case. Further, any error in admitting this evidence as rebuttal evidence is not a basis for a new trial.

Dillard's has failed to show that evidentiary errors entitle it to a new trial.

---

12. Ironically, plaintiff had originally intended to offer only summaries of these exhibits to demonstrate that African–American shoppers were stopped at a rate that was disproportionate to their representation in the pool of shoppers at the Dillard's store in the Oak Park Mall. Defendant strenuously objected to this statistical method of proof, and to make her point, plaintiff was forced to prepare a large demonstrative exhibit in the courtroom, plodding through each exhibit and tallying the reported racial composition of the suspicious shoppers at defendant's store. This water-torture method of proof, which consumed many hours, actually redounded to plaintiff's benefit because the jury thereby learned much more than the sterile statistical information which was the purpose of plaintiff's exercise. For one thing, the jury learned the astoundingly innocuous nature of conduct which Dillard's viewed as "suspicious" when committed by minority shoppers—whether black, hispanic, or otherwise. For example, the entries on the log included "two black females in dresses [department]," II Tr. Trans. at 360; "four black males and one black female made purchase and left without incident," *id.* at 365; "two groups of black females in better dresses [department]," III Tr. Trans. 394; and "two black females walking around with a list of some kind." *Id.* at 401.

## C. Jury Instructions

■ Dillard's asserts that jury instructions 10 and 17 were contradictory and misleading. Instruction 10 was given after the first phase of the trial, and provided in part that plaintiff

> claims [Dillard's] violated her civil rights under 42 U.S.C. § 1981 by intentionally denying her the right to enjoy all benefits and privileges of her contractual relationship with Dillard's, on account of her race. More specifically, plaintiff contends that [Dillard's] intentionally prevented her from redeeming a free cologne sample which Dillard's had given her as a benefit of a purchase in its children's department.

Doc. # 139. Instruction 17 was given after the second phase of the case, and stated that plaintiff

> claims that [Dillard's] violated her civil rights under 42 U.S.C. § 1981 by intentionally denying her the right to enjoy all benefits and privileges of her contractual relationship with Dillard's on account of her race. More specifically, plaintiff contends that Dillard's surveillance, detention and search of her belongings constituted a security practice which unequally burdened her as an African–American shopper.

Doc. # 142. Dillard's correctly points out that this last sentence quoted from Instruction 17 suggests an implied contract claim, and that claim was disposed of on summary judgment. But Instruction 17 set forth nothing more than plaintiff's claim. Instruction 18 specifically set out the elements of plaintiff's § 1981 claim at trial. Further, although Dillard's suggests otherwise, Instruction 18 states that in order to prove that her race was a motivating factor in Dillard's conduct, plaintiff had the burden of proving that "but for its unlawful motive, defendant would not have denied plaintiff the right to enjoy the benefits and privileges of her purchase." Taken as a whole, these and the other instructions provided a correct statement of the law and provided the jury an ample understanding of the issues and applicable legal standards. *See Allen v. Minnstar,* 97 F.3d 1365, 1368 (10th Cir.1996).

## D. Sufficiency of the Evidence

■ Dillard's argues that it is entitled to a new trial because the jury verdict with respect to liability, compensatory damages and punitive damages was contrary to the clear weight of authority. A new trial is not warranted unless the verdict was "clearly, decidedly, or overwhelmingly" against the weight of the evidence. *May v. Interstate Moving & Storage Co.,* 739 F.2d 521, 525 (10th Cir.1984).

The Court emphatically rejects Dillard' argument that the evidence in this case was not sufficient to support the verdict. Plaintiff was an extremely credible witness. Some of Dillard's witnesses, including Wilson in particular and to a lesser extent Dirks, were not similarly credible. Because the weight of the evidence was in plaintiff's favor, the reasons detailed by the Court in denying Dillard's motion for judgment as a matter of law apply here and clearly support the jury's verdict.

## III. Judgment As A Matter Of Law on Punitive Damages

■ Dillard's next argues that it is entitled to judgment as a matter of law because the evidence was insufficient to submit plaintiff's punitive damages claim to the jury. Punitive damages may be imposed in civil rights cases only if the discrimination was "'malicious, willful, and in gross disregard of [plaintiff's] rights.'" *Fitzgerald v. Mountain States Tel. & Tel. Co.,* 68 F.3d 1257, 1263 (10th Cir.1995) (quoting *Jackson v. Pool Mortgage Co.,* 868 F.2d 1178, 1181 (10th Cir. 1989)) (further quotations and citations omitted.).

Dillard's first asserts that in determining whether to award punitive damages the jury could properly consider only Wilson's conduct on this occasion, and not the prior incidents of alleged discrimination by Dillard's employees. Dillards points out that Wilson stopped plaintiff for less than five minutes and used no racial epithets. Further, although the jury did not learn of this finding, Dillard's notes that the Court found that Wilson had probable cause to stop plaintiff and search the shopping bag. Dillard's argues that if Wilson had a legal right to stop plaintiff, such a finding is inconsistent with a

finding of malice or gross disregard. The Court has already ruled that it properly kept from the jury its ruling on probable cause. Once the case went to the jury, the whole issue of Wilson's credibility was before it. The Court has observed that Wilson was not a credible witness, and the jury obviously agreed.[13]

Dillard's also asserts that plaintiff's theory was based solely on the alleged actions of Wilson, and that liability could be imputed to Dillard's only under the doctrine of respondeat superior. Dillard's cites *Fitzgerald* for the assertion that in order to hold Dillard's liable for punitive damages based on the actions of one of its employees, the agent must have the authority to "exercise control, discretion and independent judgment over a certain area of [the] business with some power to set policy for the company." *Fitzgerald,* 68 F.3d at 1263. In *Fitzgerald,* the Tenth Circuit noted that any intentional discriminatory conduct occurred "at the hands of [defendant's employee], not [the corporate defendant]," and then found that the employee had no managerial authority necessary to impute liability to the corporation. *See id.* at 1263–64 (although employee had some authority over employment decisions, she had insufficient power or control over an area of the business and no power to set company policy). In this case, Wilson did not have the authority to set policy. But here, contrary to Dillard's assertions, there was ample evidence that the act of selectively targeting Africa–Americans was authorized by Dirks and Rodgers, as managerial agents for Dillard's. In *Fitzgerald,* plaintiff did not "adequately present[ ] a theory of independent liability" against the corporation on the inadequacy of their investigation. Here, plaintiff presented substantial evidence that Dillard's knew about and ratified a policy of targeting African–Americans, and that Wilson carried out that policy.

## IV. New Trial or Remittitur on Damages

■ Dillard's argues that the amount of the total damage award demonstrates passion or prejudice, and that a new trial is required. Plainly excessive damages may support an inference that passion or prejudice contributed to the jury's award. *Fitzgerald,* 68 F.3d 1257, 1262. But "absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1168 (10th Cir.1981) (en banc).

### A. Compensatory Damages

■ Dillard's asserts that a compensatory damage award of $56,000 is excessive. The Court agrees with Dillard's assertion that because the value of the free cologne sample was negligible, the compensatory award must be premised in large part on plaintiff's evidence of emotional injury. But the Court rejects Dillard's further assertion that plaintiff's testimony about her mental suffering was insufficient as a matter of law to justify the compensatory damages award. In *Patterson v. P.H.P Healthcare Corp.,* 90 F.3d 927, 939 (5th Cir.1996), the Fifth Circuit found that a $40,000 award for emotional distress was not sufficiently supported by plaintiff's testimony that he felt "frustrated," "real bad," "hurt," and "angry." The Fifth Circuit holding was based on the fact that plaintiff did not present evidence with specificity and the record contained no evidence that he suffered from "sleeplessness, anxiety or depression." In contrast, in this case plaintiff gave eloquent and emotionally moving testimony that Wilson disgraced and humiliated her, in front of her children, that she was too emotionally distraught to drive, and that she had to call her husband for a ride home. II Tr. Trans. 326–27. Immediately after the incident she was crying and she was so upset that she could not write out a customer comment card, and a Dillard's employ-

---

13. The jury's assessment of Wilson's credibility was manifest in its verdict in phase one of the trial—before the jury heard any of the allegedly inflammatory evidence regarding racially-based treatment of minority shoppers. If the jury did not believe Wilson's testimony regarding where he detained plaintiff, it is no surprise that it rejected his testimony on the highly consequential subject of discriminatory intent.

ee filled it out for her. *Id.* at 337. She testified that "I don't feel that my life will ever be the same." *Id.* at 328. The jury was entitled to credit this testimony and to compensate plaintiff accordingly.

As noted in *Patterson,* "the harm is subjective and evaluation of it depends considerably on the demeanor of witnesses." In this case, plaintiff's testimony and demeanor left the Court with a firm conviction that plaintiff suffered genuine injury which vastly transcended the apparently trivial value of any free fragrance sample and the more substantial insult of Dillard's refusal to apologize. Plaintiff's testimony was eminently credible. Having observed the witnesses and heard the evidence, the Court can not say that the actual damage award was based on improper passion and prejudice.

### B. New Trial on Punitive Damages

■ Dillard's also asserts that the punitive damage award was excessive and requires a new trial. In so arguing, Dillard's again raises the same evidentiary and jury instruction issues raised before. The Court has found, however, that any trial errors did not affect the substantial rights of the parties. Thus they do not require reversal of the punitive damages award. Further, the alleged fact that the foreperson approached plaintiff after the verdict and kissed her on the forehead is not evidence of passion and prejudice.

### C. Constitutionality of Punitive Damages Award

■ Relying on *BMW of N. Am. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Dillard's asserts that the punitive damages award of $1,100,000 violated the due process clause of the United States Constitution. In *Gore,* the Supreme Court struck down a punitive damages award of $2,000,000 where plaintiff's purely economic injuries were $4,000. The Supreme Court found that the punitive damages award, which had been reduced from $4,000,000 on appeal to the Alabama Supreme Court, violated the Fourteenth Amendment substantive due process clause. In this case, in federal court, Dillard's claim is a Fifth Amendment substantive due process challenge. The Court need not address how the fact that this is a Fifth Amendment rather than a Fourteenth Amendment claim might affect the analysis,[14] because this case is distinguishable from *Gore* on many fronts.

In *Continental Trend Resources v. OXY, Inc.,* 101 F.3d 634 (10th Cir.1996), on remand in light of *Gore,* the Tenth Circuit reduced from $30,000,000 to $6,000,000 a punitive damages award for tortious interference with contract and prospective business advantage. In that case the jury had awarded $269,000 in actual damages. In that context the Tenth Circuit interpreted *Gore* as follows.

First, the punitive damage award must relate to conduct occurring within the state. *Continental Trend,* 101 F.3d at 636–37. This factor does not weigh in favor of remittitur because this is a federal case.[15] *Cf. Gore,* 116 S.Ct. at 1604 (state jury increased punitive damage award based on conduct outside state, which conduct was legal where it occurred; award thus infringed on policy choices of other states).

Second, defendant must receive "fair notice ... of the conduct that will subject [defendant] to punishment." *Continental Trend,* 101 F.3d at 638 (quoting *Gore,* 116 S.Ct. at 1598.) "[S]ection 1981 ... has always authorized the recovery of compensatory and punitive damages." *Carter v. Sedgwick County,* 36 F.3d 952, 955 (10th Cir. 1994). Thus this factor does not weigh in favor of a remittitur.

Third, defendant must receive "fair notice ... of the severity of the penalty" that may be imposed. 116 S.Ct. at 1598. The Supreme Court set out three "guideposts" for

---

14. Federal courts have suggested that the Fifth Amendment due process protection would apply "equally to the review of punitive damages awarded in federal court." *Lee v. Edwards,* 101 F.3d at 809 n. 2 (2d Cir.1996).

15. Even if the jury considered conduct outside the state, in this federal civil rights case that would not be objectionable. *See Deters v. Equifax Credit Info. Servs., Inc.,* 981 F.Supp. 1381, 1389 (D.Kan.1997) (the federalism concerns expressed in *Gore* have no bearing on the analysis in a purely federal case).

this requirement: "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of the punitive award to the actual harm inflicted on plaintiff, and (3) the comparison between the punitive award and the civil or criminal penalties that could be imposed for comparable misconduct." *Continental Trend,* 101 F.3d at 638; *Gore,* 116 S.Ct. at 1598–1603. In this case, the degree of reprehensibility is assuredly higher than defendant's conduct in *Gore* (repainting a car before selling it). *See McKnight v. Circuit City Stores, Inc.,* 1997 WL 328638, at *7 (E.D.Va. March 12, 1997). The ratio of punitive damages to harm inflicted (about 20 to 1) may be high but as the Supreme Court noted, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." 101 F.3d at 639, quoting *Gore,* 116 S.Ct. at 1602. Both examples apply in this case. Also, the 20 to 1 ratio here does not in itself violate due process. *See, e.g., Deters v. Equifax Info. Servs.,* 981 F.Supp. 1381 (D.Kan.1997) (hostile environment sexual harassment; jury awarded $5,000 in compensatory and $1,000,-000 in punitives; court amended judgment for punitives to bring total damages within statutory cap and found $295,000 punitives did not violate substantive due process);

Additionally, the Tenth Circuit has noted that a substantial punitive award may be required to "influence the behavior of a prosperous corporation." *Continental Trend,* 101 F.3d at 641. The Court acknowledges the Supreme Court's note that caution must be exercised in considering the size of a defendant, but adds that to a large degree that caution is based upon a concern that state courts not unduly burden interstate commerce. *See Continental Trend,* 101 F.3d at 641, citing *Gore,* 116 S.Ct. at 1604. Such a concern is not relevant to a federal civil rights case such as this.

Finally, this case is different from cases like *Gore* and *Continental Trend,* which or-

dered remittiturs in cases involving "mere economic damages." *Deters,* 981 F.Supp. at 1391 (citing *Federal Deposit Insurance Corporation v. Hamilton,* 122 F.3d 854, 861–62 (10th Cir.1997); *Continental Trend,* 101 F.3d at 638; *Gore,* 116 S.Ct. at 1599.) Rather, it involves personal injury and emotional damages. The punitive damage award in this case, though large, is not unjustly so. It does not violate substantive due process. Dillard's motion for a remittitur on this basis is denied.

**IT IS THEREFORE ORDERED** that Dillard's *Motion for Judgment As A Matter of Law, Or Alternately For A New Trial Or Remittitur,* (Doc. # 150) filed December 19, 1997 be and hereby is **OVERRULED.**